UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Kinetic Systems, Inc.

v.                                    Civil No. 20-cv-1125-SM
                                      Opinion No. 2024 DNH 008
IPS-Integrated Project Services, LLC
and Lonza Biologics, Inc.


**O R D E R**

This dispute arises out of a commercial construction project in Portsmouth, New Hampshire.  Kinetic Systems, Inc. was a subcontractor on that project and brought an action against Integrated Project Services, LLC ("IPS"), the project's general contractor, and Lonza Biologics, Inc., the owner, seeking nearly $14 million for extra work it alleges that it did on that project.[1]  IPS moves for partial summary judgment, challenging Kinetics's breach of contract claim for payment of amounts related to certain changes in the project.  Kinetics objects to summary judgment, arguing that material factual disputes as to whether IPS waived contract provisions preclude summary judgment

---

[1] In the complaint, the plaintiff refers to itself as "Kinetics" although the name of the company is Kinetic Systems, Inc.  In the current motions and memoranda, the plaintiff refers to itself as "KSI", while IPS uses "Kinetics". On its website, the plaintiff refers to itself as "Kinetics".  www.kinetics.net (last visited January 18, 2024).  To avoid confusion, the court will consistently refer to the plaintiff as "Kinetics".

and that the partial waivers and releases it signed are not
enforceable.

### Standard of Review

Summary judgment is appropriate when the moving party shows
that there is no genuine dispute of material fact and that it is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);
M.L. by and through D.L. v. Concord Sch. Dist., 86 F.4th 501,
510 (1st Cir. 2023) (internal quotation marks omitted).  A
genuine dispute "is one that must be decided at trial because
the evidence, viewed in the light most flattering to the
nonmovant, would permit a rational factfinder to resolve the
issue in favor of either party." Id. (internal quotation marks
omitted).  "Material facts are those that might affect the
outcome of the suit under the governing law." Id.  Therefore,
no genuine dispute of material fact is shown "if, based on the
record, there is no factual determination which a rational
factfinder could make as to the existence or nonexistence of a
fact that has the potential to change the outcome of the suit."
Gibson Found., Inc. v. Norris, 88 F.4th 1, 5 (1st Cir. 2023).

### Background

IPS was the general contractor on a project to construct a
manufacturing facility for Lonza.  It, in turn, hired Kinetics

to construct and implement mechanical and process systems at the Lonza facility.  That subcontracting relationship was governed by two contracts:  the Early Mechanical Subcontract and the Process Piping Subcontract.  Each Subcontract requires IPS to pay Kinetics a lump sum for the work specified.  The Subcontracts also include provisions for changing the scope of work, increasing the amount to be paid, and resolving disputes about changes and payments.

A.   Subcontract Provisions for Changing Work and Payment

The Subcontracts require certain procedures to make changes to the scope of Kinetics's work on the project, including changes to the time required and payments due, which are found in Section 6 of each Subcontract, titled "Changes in the Work." Doc. no. 57-2, at 20-22; Doc. no. 57-8, at 20-22.  Section 7 provides the procedures for payment, and Section 12 provides the procedures for claims and disputes between IPS and its subcontractors.  Doc. no. 57-2, at 22-23 & 57-2, at 35-36; Doc. no. 57-8, at 22-3 & 57-8, at 35-36.[2]

To make a change to the requirements in the Subcontracts, IPS first is required to notify the subcontractor of the

---

[2] The Subcontracts include the same language pertinent to changes in the work and related procedures.  The court will cite to the Subcontract sections rather than the documents where the Subcontracts are filed.

proposed change.  § 6.2.  After receiving notice - but before
beginning the work - the subcontractor is required to submit "a
written proposal for the Change, which proposal shall include,
(a) the modification to the scope of Work to be performed under
the proposed Change, (b) Subcontractor's good faith estimate of
the adjustment in the Subcontract Price payable as a result of
the proposed Change, and (c) Subcontractor's estimate of the
adjustment, if any, to the Subcontract Time resulting from the
proposed Change."  § 6.4.  IPS then decides whether to accept or
reject the subcontractor's written proposal for an adjustment to
the subcontract.  Id.  If a subcontractor does not request a
time or cost adjustment through a timely proposal, the
subcontractor is deemed to represent that no adjustment is
required and waives its right to any adjustment for that Change.
§ 6.5.

The subcontractor is required to submit all claims for
adjustment due to a change in the work within the time provided
in the change notice.  § 6.8.  If no time is provided, then
claims are to be made within five business days of the date of
the notice "but in no event less than two (2) Business Days
prior to the date upon which IPS must respond with all such
claims under the Prime Contract, whichever period is shorter."
Id.  The parties expressly agree that the subcontractor waives
any claims for adjustment to the price and time provided in the

4

Subcontracts if a claim is not submitted to IPS within the time allowed.  Id.

A subcontractor can also make claims for increases in the price or time for the work "[d]ue to acceleration, disruption, inefficiency or for any other reason which may adversely impact the Work or Subcontractor's performance under the Agreement within two (2) Business Days following the occurrence of the event giving rise to the claim."  § 6.12.1.  Such claims have to be supported by "appropriate information and documentation."  Id.  The Subcontracts also provide that "Subcontractor's timely compliance with the notice requirements in section 6.12.1 shall be a condition precedent to Subcontractor's entitlement to a Subcontract adjustment in either the time or price and Subcontractor waives and releases any claim to additional compensation or an extension of time in the event that Subcontractor does not so comply." § 6.12.4.

If the parties are unable to agree upon a price for Kinetics's additional work, the Subcontracts allow IPS to compel Kinetics to perform the work through a "Change Directive," after which the parties were committed to agree upon an appropriate adjustment to the price and time allowed.  § 6.6.  Importantly, however, Anthony Malvone, IPS's Operations Manager, states in his declaration that IPS did not issue a Change Directive to Kinetics for the Lonza project to compel Kinetics to perform

5

work outside the scope of the Subcontracts.  Doc. no. 57-25, ¶
12.  Kinetics does not dispute that statement.

The Subcontracts also provide a process for resolving
claims and disputes between IPS and its subcontractors.  § 12.2.
The claims or disputes "shall first be attempted to be resolved
by good-faith negotiation between senior management of the
Parties."  § 12.2.1.  Second, if that process is unsuccessful,
"then the Parties agree to try in good faith to settle the
claims or disputes (or remaining portion thereof) by mediation
administered by the American Arbitration Association."  Id.
Finally, if unresolved disputes remain, the Subcontracts
establish a bifurcated dispute resolution process, depending on
the amount at issue.  For disputes involving amounts less than
$250,000, the parties agree that such disputes shall be resolved
by arbitration.  § 12.2.1.1.  For disputes involving $250,000 or
more, the parties agree that they may be resolved by arbitration
or by litigation.  § 12.2.1.2.


      B. Work Changes on the Lonza Project

Originally, IPS agreed to pay Kinetics $2,376,659 as a lump
sum for work done under the Early Mechanical Subcontract and
$1,800,000 for work done under the Process Piping Subcontract.
Because of certain changes it made to the project, IPS increased
the amount due under the Early Mechanical Contract to $4,084,781

6

and increased the amount due under the Process Piping
Subcontract to $11,589,725.  Those increased amounts do not
include other additional payments Kinetics requested during the
project that IPS did not approve.

After receiving notice from IPS of proposed changes in the
project and before beginning work on those changes, Kinetics
submitted Change Proposal 4, CP-4, to increase the payment under
the Early Mechanical Subcontract.  IPS approved CP-4 through
Change Order 2.  After again receiving notice of proposed
changes, Kinetics submitted CP-6, again before beginning the
work, but IPS rejected the proposed adjustment in payment
because it included costs within the agreed scope of the work.
Kinetics then proceeded with the work despite IPS's rejection of
CP-6.

In December of 2019, Kinetics submitted CP-10 seeking
additional payments for the period between June 16 and September
29, 2019.  IPS rejected CP-10 as untimely because it was
submitted after Kinetics completed the work.  The parties later
engaged in a negotiation process to address the disputed amounts
in CP-10.  In the course of the negotiation process, IPS and
Kinetics agreed to Change Order 7 in July 2020 that allowed part
of the payment Kinetics sought in CP-10.

During the project, IPS also issued Bulletins to make
changes to the project, and some of those changes affected the

7

scope of Kinetics's work.  Each Bulletin includeds a request
that the recipient respond within ten days to notify IPS of any
cost or schedule impact from the Bulletin and stated that no
response would indicate there would be no schedule or cost
impact.  Kinetics submitted Change Proposals in response to ten
Bulletins, but all of them were submitted late, significantly
more than ten days after the Bulletin issued.  IPS rejected the
untimely Bulletin Change Proposals.  Kinetics resubmitted some
of the amounts claimed in the rejected Bulletin Change Proposals
as Change Proposal 24, CP-24, which IPS partially approved later
as part of the dispute negotiation process.

C.  Waivers and Releases

During the project, Kinetics requested progress payments
from IPS for work done under the Subcontracts.  Each request
included a "Subcontractor Partial Waiver and Release" signed by
Kinetics.  Doc. no. 57-7 at 29-30.  The Waiver and Release
provides that, when a subcontractor receives a progress payment
in consideration for work done, the subcontractor "represents
and warrants that it has been paid on the above-referenced
Project for all [Work] the Releasor heretofore furnished for the
Project for [Services] and does hereby and forever hereafter,
waive and release any and all such rights and claims it has
against the Property, Work and Services or any lien discharge

bond with respect to the above described Project . . . ."  Doc.
no. 57-7 at 29.  Kinetics signed the Waivers and Releases when
it received each progress payment.

      D.  <u>Procedural History</u>

      Kinetics did not receive all of the payments it sought from
IPS for its work on the Lonza project and filed a complaint in
state court, alleging claims against IPS for breach of contract
(Count I) and quantum meruit/unjust enrichment (Count II) as
well as a claim against Lonza (the project owner) for quantum
meruit/unjust enrichment (Count III).  The defendants removed
the case to this court and moved to dismiss.  The court granted
the motion to dismiss as to Kinetics's quantum meruit/unjust
enrichment claim against IPS, Count II, but otherwise denied the
motion.  Doc. no. 15.  Later, Kinetics entered a stipulation
"that all claims of [Kinetics] against Lonza [the project owner]
are dismissed WITH PREJUDICE."  Doc. no. 69.  Kinetics's only
remaining claim in the case is breach of contract against IPS,
Count I.

      In that claim, Kinetics alleges that it did extra work on
the Lonza project, with a value of $5,627,002.95, that is
"related to unprocessed and/or unpaid change orders [and]
additional work welds."  Doc. no. 1-2, at 7.  Kinetics also
alleges that its work and costs for the project "were negatively

impacted" by IPS's "failure to properly schedule and manage the overall project work" that caused additional costs in the amount of $960,392.44.  Id.  Kinetics further alleges that IPS's failures in managing the project caused Kinetics to "incur[] labor and overtime inefficiencies not reasonably calculated by or under the Contracts in an amount of no less than $6,000,000" that are characterized as "impact damages and costs."  Id. at 7-8.  In total, Kinetics seeks $13,973,898.26 from IPS for breach of contract.

**Discussion**

IPS moves for summary judgment on Kinetics's breach of contract claim to the extent it is based on Kinetics's Change Proposals that IPS did not approve.  IPS also contends that Kinetics waived and released the breach of contract claim as to those amounts by accepting progress payments without making or preserving claims for additional amounts.  Kinetics objects, arguing that there is a genuine factual dispute as to whether IPS waived the timeliness requirement for Change Proposals in the Subcontracts and that the Releases and Waivers provided as part of the progress payments are not enforceable.

A.   Unapproved Change Proposals

IPS challenges Kinetics's claim for additional payments
(above the lump sum amounts and approved increases) that
Kinetics submitted in untimely and unapproved Change Proposals.
More specifically, IPS contends that Kinetics cannot recover the
additional amounts it seeks based on CP-10, Bulletin Change
Proposals, and CP-24.   Kinetics does not dispute that Section 6
of the Subcontracts required it to submit Change Proposals
before it did the work for changes in the project.   Kinetics
also does not dispute that it submitted CP-10, Bulletin Change
Proposals, and CP-24 after the work was completed.   Kinetics
contends, however, that IPS waived the timeliness requirement
for Change Proposals.

"The written terms of a contract may be waived orally or by
implication." D.M. Holden, Inc. v. Contractor's Crane Serv.,
Inc., 121 N.H. 831, 835 (1981); see also Fraser Eng'g Co., Inc.
v. IPS-Integrated Project Servs., LLC, 2018 DNH 67, 2018 WL
1525725, at *8 (D.N.H. Mar. 27, 2018).[3]  Waiver by implication

---

[3] Kinetics provides a long summary of the court's decision
in Fraser Engineering Co., Inc. IPS-Integrated Project Services,
LLC, 2018 WL 1525725 (D.N.H. Mar. 27, 2018), to support its
objection to summary judgment.  In Fraser, the plaintiff, a
different subcontractor on the Lonza project, moved to perfect a
mechanics lien on the Lonza property because it alleged that IPS
and Lonza withheld payments for its work on the project.  Id. at
*1.  There, "[t]he sole issue before the court [was] whether
Fraser [could] perfect a mechanics lien on [Lonza's] property."
Id. at *1.  The court overruled the defendants' objections to

occurs when the parties disregard the terms of a written contract and proceed in a manner that is contrary to those terms.  Id. at 834-35.  To constitute waiver, however, the waiving party's actions must clearly demonstrate "an actual intention of foregoing a right."  Gianola v. Cont'l Cas. Co., 149 N.H. 213, 214 (2003) (internal quotation marks omitted).

So, for example, when a contract required written approval prior to payment but the parties never followed that requirement in their course of dealings, the requirement for prior approval was waived.  D.M. Holden, 121 N.H. at 834-35; see also Axencis, Inc. v. Turner Constr. Co., 164 N.H. 659, 666 (2013) (stating that parties' actions may constitute abandonment of a contract only if their actions are "positive, unequivocal and inconsistent with an intent to be further bound by the contract"); City of Portsmouth v. Nash, 126 N.H. 464, 468-69 (1985) (holding that city consistently demonstrated its intent to limit charges for unpaid services so that its waiver of additional charges could be inferred from its conduct).  On the other hand, no waiver may be inferred from a course of dealing when the parties routinely followed the contractually required

---

the lien and granted the plaintiff's motion to perfect the lien based on the "remedial nature of the mechanics lien law." Id. at *7.  Kinetics is not seeking a mechanics lien and has not shown that the Fraser decision addresses the waiver issue Kinetics raises in opposition to summary judgment here.

procedures.  See RAM Constr. Servs. of Cleveland, LLC v. Key
Constr., Inc., 624 F. Supp. 3d 884, 895-96 (N.D. Ohio 2022).


       1. Course of Dealing

The parties followed the Section 6 process for changes in
the work, to a point.  On April 12, 2019, IPS approved
Kinetics's Change Proposal, CP-4, and issued a Change Order to
add labor charges to the Early Mechanical Subcontract for the
period between April 15 and June 20, 2019.  CP-4 was submitted
before the work began and was approved under the Section 6
process - all in a manner that is consistent with the
Subcontracts' requirements.

 Kinetics then submitted CP-6 to IPS on July 25, 2019,
proposing an increase in payment for the period from July 29 to
November 16, 2019.  Kinetics again followed the timeliness
requirement under Section 6.  Although CP-6 was timely, IPS
denied it because Kinetics sought amounts that were already
included in the Subcontracts' payment.  Once again, the parties
followed the Subcontracts' process.

Kinetics then submitted CP-10, after it did the work, which
was contrary to the Subcontracts' requirements.  IPS rejected
CP-10 as untimely.  That event demonstrates that although
Kinetics did not follow the timeliness procedure, IPS did adhere
to the requirement and did not approve CP-10.  The parties'

interactions demonstrate that when Kinetics filed an untimely Change Proposal, IPS continued to require compliance.  Those interactions, therefore, do not show that IPS waived the timeliness requirement based on the parties' "course of dealings."

Kinetics argues, however, that IPS disregarded Section 6 and waived the timeliness requirement "[i]n giving instructions to [Kinetics] to commence work without first satisfying a contractual change order process, [y]et still paying for change order work, IPS established a course of dealing."[4]  Doc. no. 64, at 14.  It is not clear to the court what actions Kinetics contends were instructions from IPS to work without an approved change order.  To the extent Kinetics is referring to a Change Directive, a process by which IPS could require work before it issued a Change Order, Anthony Malvone, Operations Manager of the Lonza project for IPS, stated in his declaration that IPS never issued a Change Directive to Kinetics, and Kinetics has

---

[4] Kinetics also argues more generally that because IPS pushed Kinetics to accelerate work on the Lonza project to meet an aggressive schedule, the court should presume that IPS did not want Kinetics to wait for Change Orders before doing the work and that IPS waived the timeliness requirement for Change Proposals.  Doc. no. 64 at 2 & 8.  Waiver, however, cannot be presumed and, instead, requires a clear expression in words or action of the intent to relinquish a right.  See Daniel v. Hawkeye Funding, Ltd. P'ship, 150 N.H. 581, 584 (2004); Gianola, 149 N.H. at 214.  To the extent Kinetics also represents that IPS expressly waived the timeliness requirement, it did not cite record evidence to support that assertion.

not introduced contrary evidence.  In any case, Change
Directives are authorized under the Subcontracts - §§ 6.1 & 6.6
- and if IPS had issued a Change Directive, that action would
not show that it disregarded the requirements in the
Subcontracts or agreed to a modification of those requirements
to support an inference of waiver.

Next, Kinetics cites a letter from Malvone to the President
and General Manager of Kinetics, Richard McAllister, that is
dated March 13, 2020, to show that IPS disregarded and waived
the requirements of the Subcontracts.  Doc. no. 64-6.  The
letter addressed "Delay in Project Completion" and a "recovery
plan and schedule" that IPS expected, but Kinetics had not
provided.  Id.  In the letter, Malvone stated that Kinetics was
in breach of the Subcontracts and stated that it would consider
"any further delay an anticipatory repudiation of [Kinetics's]
contractual obligations under those agreements."  Id.

On its face, the March 13 letter focused on Kinetics's
existing contractual obligations and Kinetics's apparent failure
to meet some of those obligations.  It warned Kinetics that
leaving the project before those obligations were complete would
constitute breach.  Those statements do not show that IPS
disregard any provision in the Subcontracts and do not support a
waiver theory.

15

Malvone did address an incident that had occurred that day, as an example of Kinetics's continuing breaches.  Malvone wrote that Kinetics refused to complete a "1½ foot spool piece."  Id. at 3.  Malvone noted that the Subcontracts provided "that upon direction, [Kinetics] must continue with the work, irrespective of whether a change order was issued or not."  Id.  Arguably, Malvone was referring to a Change Directive as provided in §§ 6.1 and 6.6, although the letter does not indicate that a Change Directive issued.  Even if that single incident were construed as a variation from the process required under the Subcontracts, it occurred long after Kinetics submitted the untimely Change Proposals at issue here and could not support a waiver of the timeliness requirement that IPS previously enforced as to those Change Proposals.

Malvone acknowledged that Kinetics was claiming $13.5 million in additional costs for its work on the project.  He pointed out, however, that Kinetics had not provided the "fundamental information" to support its claims in order to proceed to discussion of the claims.  Id.  As such, Malvone wrote that Kinetics was not abiding by the requirements of the Subcontracts, which does not suggest a waiver of those requirements.

Kinetics has not shown that the March letter or any other record evidence supports its argument that IPS waived the

16

timeliness requirement in the Subcontracts for Change Proposals or that IPS instructed it to work without a Change Order in any significant amount.  Instead, the record evidence shows that IPS's actions during the parties' course of dealing largely complied with the Subcontracts' requirements.

### 2.   Change Proposal 10

Nevertheless, Kinetics argues that IPS waived the timeliness requirement for CP-10 when it paid some of the amount Kinetics requested.  Kinetics represents that IPS first rejected CP-10 as untimely but subsequently paid part of the amount due under CP-10, despite its untimeliness.  That action, Kinetics asserts, amounts to a waiver of the timeliness requirement. But, Kinetics gives only part of the story.

Kinetics submitted CP-10 to IPS on December 20, 2019, seeking adjustments to the Early Mechanical Subcontract for work performed between June 16, 2019, and September 29, 2019.[5]  CP-10 was submitted after Kinetics did the work for which it sought payment, and IPS rejected CP-10 as untimely.  As such, IPS adhered to the timeliness requirement for Change Proposals, and there was plainly no waiver of such requirements.

---

[5] CP-10 may have included adjustments for work and costs proposed in CP-6, which were previously denied.  Kinetics has not shown that a relationship, if any, between CP-6 and CP-10 is material to the breach of contract claim.

IPS and Kinetics <u>then</u> negotiated the dispute about Kinetics's claim for additional payment, as was required under Section 12 of the Subcontracts.[6]  As part of their negotiations, IPS and Kinetics agreed to Change Order 7, dated July 9, 2020, that increased the Early Mechanical Subcontract by part of the amount sought in CP-10.  Because dispute negotiation is required by Section 12 of the Subcontracts, that process shows that IPS adhered to the contractual requirements and does not support Kinetic's waiver argument.[7]  IPS did not waive the timeliness requirement for CP-10; it engaged in the contractually required dispute resolution process.

---

[6] Kinetics cites testimony by Lonza's Project Director to show that IPS waived the timeliness requirement by paying part of CP-10 although it was untimely.  The cited testimony, however, is about the negotiation process that resulted in Change Order 7.  The cited testimony shows that the parties followed the contractual dispute negotiation requirements and does not show that IPS waived the timeliness requirement for CP-10.  <u>See also, e.g.</u>, doc. no. 64-3 (discussing dispute resolution process) & doc. no. 64-5 (same).

[7] Kinetics quotes <u>MacQuesten Gen. Contracting, Inc. v. HCE, Inc.</u>, 191 F. Supp. 2d 407, 411 (S.D.N.Y. 2002), for the proposition that a factual issue exists as to whether the parties intended "to implement a system of partial payment for work performed and as to the nature and function of the partial waivers."  There, however, the issue was whether waivers signed by the subcontractor were effective not whether contractually required negotiations and compromise constituted waivers.  <u>Id.</u> For these reasons, <u>MacQuesten</u> does not support the argument that a material factual dispute exists as to whether IPS waived the timeliness requirement for CP-10.

As to CP-10, Kinetics has not shown a material factual dispute regarding its claim that IPS breached the Subcontracts by not approving the change and paying the additional amount proposed.  IPS is entitled to summary judgment to the extent Kinetics alleges breach of contract based on IPS's failure to pay the entire amount sought in CP-10.

### 3.   Bulletins and Change Proposal 24

Some of the amounts Kinetics seeks for breach of contract arose from changes IPS made to the scope of work through Bulletins, which are referred to as "indirect" or "inefficiency" costs.  Each Bulletin required a response within ten business days to notify IPS about any cost or schedule impacts that would arise from the changes made in the Bulletin, and each stated that no response would indicate that the changes would not have an impact on the schedule or cost of the project.  Despite that ten-day deadline, Kinetics submitted Change Proposals, seeking additional payments for impacts caused by the Bulletins, far beyond the time allowed.  IPS rejected those proposals as untimely.  Kinetics later changed tactics, removed some of the amounts sought in its Change Proposals, and resubmitted them as CP-24.  IPS paid some but not all of the amounts sought in CP-24.

Kinetics argues that IPS waived the timeliness requirements for Change Proposals in response to the Bulletins.  The parts of the record cited to support that theory, however, again pertain to the parties' negotiations about those disputes after the fact, not to any waiver by IPS of the timeliness requirements when Kinetics submitted Change Proposals in response to Bulletins.

Specifically, Kinetics cites deposition testimony by its project manager, Robert Booker, to show that IPS waived the timeliness requirement.  When Booker was asked whether Kinetics submitted timely Change Proposals in response to the Bulletins, he refused to answer, "yes or no," as he was directed to do. Instead, he argued that "a lot of the bulletins that we received from IPS were post-design bulletins" so that work had already begun before Kinetics received the Bulletin.  Doc. no. 64-5, at 139.

To the extent Kinetics argues that IPS waived the timeliness requirement for "post-design bulletins," that theory is not developed or supported by competent evidence.  The theory is also undermined by Booker's deposition testimony that IPS did not approve the untimely Change Proposals.[8]  Instead, those

---

[8] Kinetics does not cite evidence that it objected to IPS's rejection of its late Bulletin Change Proposals on the ground that IPS had issued "post design" Bulletins.

disputed amounts, rejected as untimely, were later addressed in
the negotiation and compromise process, as is specifically
provided for in the Subcontracts.

In short, Kinetics has not demonstrated that IPS
disregarded the Subcontracts or that IPS waived the timeliness
requirements for CP-24 and the untimely Bulletin Change
Proposals.  As a result, IPS is entitled to summary judgment on
that part of Kinetics's breach of contract claim that seeks
payment under the Bulletin Change Proposals and CP-24.


B.  Waivers and Releases

In the alternative, IPS seeks summary judgment on the
ground that Kinetics forfeited all claims for additional
payments by accepting partial payments and representing that it
had been paid for all work and costs up to the time of payment.
Kinetics acknowledges that it signed the Subcontracts (with
waiver provisions) and signed the waivers and releases as it was
required to do to receive partial payments.  Kinetics argues,
however, that the waivers and releases cannot be enforced or
were themselves waived.

As part of the Subcontracts, Kinetics agreed that "[t]he
acceptance by Subcontractor of each progress payment from IPS
shall constitute a waiver and release by Subcontractor of all
claims of any kind against IPS for payment for Work performed up

to the date of Subcontractor's estimate for payment against

which payment was made and accepted." Doc. no. 57-2, § 7.9.

That waiver and release excluded "only Subcontractor's

entitlement to retainage withheld in connection with such

payment and any disputed amount withheld from payment by IPS."

Id.  Each time that Kinetics requested and accepted partial

payment under the Subcontracts, it signed a "Subcontractor

Partial Waiver and Release" form.[9]  Included in each form is the

following statement:

> Releasor represents and warrants that it has been paid
> on the above-referenced Project for all work, labor,
> materials, subcontract work, equipment, rents,
> services, materials and/or supplies (hereinafter
> collectively the **"Work"**) the Releasor heretofore
> furnished for the Project for construction, design,
> improvement, alteration, additions, repair or for any
> other reason or type of service (hereinafter
> collectively the **"Services"**) and does hereby and
> forever hereafter, waive and release any and all such
> rights and claims it has against the Property, Work
> and Services or any lien discharge bond with respect
> to the above described Project . . . .

Doc. no. 57-7, at 29.

But, says Kinetics, the waivers and releases it signed are

not enforceable as waivers of the right to a mechanic's lien,

based on the result in Fraser, 2018 WL 1525725, at *7.

Kinetics, however, is not seeking a mechanics lien in this case.

---

[9] IPS submitted releases signed by Kinetics between March
19, 2019, and July 20, 2020.

Kinetics has not shown that the result in <u>Fraser</u> would save its breach of contract claim here.

Kinetics also argues more generally that the waivers and releases it signed for purposes of the progress payments and that are included in the Subcontracts are not enforceable because IPS knew that it owed Kinetics for labor inefficiencies, citing <u>Fraser, 2018 WL 1525725</u>, at *6. But, it is not necessary to determine whether Kinetics can avoid the effects of the Subcontracts' waiver provisions and the express waivers and releases it signed when it received partial payments. Even if Kinetics could show those waivers and releases were ineffective or unenforceable (or that there is a material factual dispute as to enforceability) - which it has not done - it concedes that it did not provide timely Change Proposals as required under the Subcontracts. It also concedes that IPS did not approve the untimely Change Proposals. Kinetics has not shown that IPS waived the Subcontracts' timeliness requirement or that a genuine and material factual dispute exists as to IPS's alleged waiver.

Therefore, IPS is entitled to summary judgment, and the court will not address the effects of the waivers and releases as they may relate to mechanics liens or more generally to Kinetics's remaining claim in this case.

23

### Conclusion

For the foregoing reasons, IPS's partial motion for summary judgment (doc. no. 57) is granted to the extent the breach of contract claim in Count I is based on amounts that IPS failed to pay in response to CP-10, CP-24, and the Bulletin Change Proposals that were rejected as untimely.

Kinetics shall file a notice within **fourteen days of the date of this Order** specifying what part, if any, of Count I remains in dispute for trial.

SO ORDERED

_____
Steven J. McAuliffe
United States District Judge

February 6, 2024

cc: Counsel of record.